PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WALTER J. HIMMELREICH, | ) | |
| | ) | CASE NO. 4:10CV2404 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| FEDERAL BUREAU OF PRISONS, *et al.*, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendants. | ) | **ORDER** [Resolving ECF No. 142] |

Before the Court is Defendants' motion for summary judgment (ECF No. 142). Plaintiff

responded in opposition (ECF Nos. 156, 157),[1] and Defendants replied (ECF Nos. 163, 164).[2]

Having reviewed the record and the applicable law the Court determines that oral argument is not

needed. For the reasons stated herein, the motion is granted as to Defendants Simmons and Butts

and denied as to Defendant Fitzgerald.

**I. Background**

Plaintiff Walter J. Himmelreich is a federal inmate who was previously located at FCI

Elkton, a federal correctional institution in Ohio. Plaintiff asserts *Bivens*[3] claims against the

three remaining defendants arising under the First and Eighth Amendments to the United States

---

[1] ECF No. 156 is redacted and publicly accessible. ECF No. 157 is sealed. To the extent
practicable, the Court cites to publicly accessible documents.

[2] ECF No. 163 is redacted and publicly accessible. ECF No. 164 is sealed. To the extent
practicable, the Court cites to publicly accessible documents.

[3] *Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics*, 403 U.S. 388
(1971).

(4:10cv2404)

Constitution.

## A. Claim Against Officer Simmons

Against Defendant Simmons, a Corrections Officer at FCI Elkton, Plaintiff asserts a claim of failure to protect in violation of the Eighth Amendment. Plaintiff alleges that, on October 11, 2008, fellow FCI Elkton inmate Roger Oberkramer threatened to assault Plaintiff. ECF No. 147-1 at PageID #: 1092. On October 14, 2008, FCI Elkton inmate Peter Macari, during a meeting with his Unit Disciplinary Team, refused to leave the Special Housing Unit ("SHU") as scheduled. ECF No. 143-4. On October 16, 2008, Macari, in writing, expressed anxiety about his confinement[4] and stated that, if released from segregated housing into the general prison population, he would "smash a pedophile." Id. at PageID #: 915. By Plaintiff's account, Plaintiff was "reputedly, among the inmate community, one of the biggest pedophiles on the Elkton compound and is aware that other inmates have that perception of him." ECF No. 1 at PageID#: 6. Macari was released from segregated housing to the general population on October 20, 2008. ECF No. 142-1 at PageID#: 723.

That same day, as inmates were returning to their dormitory units from their daily work assignments (during the "recall movement"), Macari located Plaintiff in an upper stairwell landing, just in front of the inner door to the housing area, and assaulted him as Oberkramer looked on. Id. at PageID#: 723-24. The assault lasted "a minute or two," and about 25 other

---

[4] "I have had a lot of stress here, am not able to live with pedophiles. Also, I am not able to take the right programs here, Everything seems to be going against me." ECF No. 143-4 at PageID#: 915.

inmates were inside the stairwell at the time of the incident, chanting "fight, fight!" ECF No. 147-1 at PageID#: 1026, 1041. Plaintiff says that Macari's assault was "very strong, very forceful . . . a pummeling that [he] had never been subjected to before." Id. at PageID#: 1026.

At the time the assault took place, Officer Simmons (the officer on duty) was standing down the stairs, through the sally port, just outside the building exterior (about ten feet from the inner door), watching the inmates enter the unit building. Id. at PageID#: 1035-37. According to Plaintiff, the inner door was propped open, and Officer Simmons should have been able to hear the commotion from where he stood. Id. at PageID#: 1038-39, 1041, 1051. Shortly after the assault, Officer Simmons found Plaintiff sitting in the stairwell, reported the event to his superior, locked down the unit, and escorted Plaintiff to the Security Office and then to the Lieutenant's Office. Id. at PageID#: 1064-66; ECF No. 143-1 at PageID#: 892.

### B. Claim Against Lieutenant Butts

Against Defendant Butts, a former Special Investigative Services Lieutenant at FCI Elkton, Plaintiff asserts claims under the Eighth Amendment pertaining to Lieutenant Butts' response to Macari's threat as well as his investigation of the assault and his alleged oversight of Plaintiff's SHU placement. Specifically, Plaintiff alleges that Lieutenant Butts failed to protect him from Macari's assault by releasing Macari from the SHU into the general prison population even though, as a member of the Special Investigative Services team, Butts had been made aware of the serious risk posed to Plaintiff's safety by Macari's release from the SHU. ECF No. 156 at PageID #: 1596-97; see ECF No. 1 at PageID #: 6. Plaintiff also alleges that Lieutenant Butts violated his constitutional rights by failing to refer Plaintiff's assault to the FBI for criminal

3

prosecution and by failing to override Captain Fitzgerald and unilaterally release Plaintiff from his later placement in the SHU.  ECF No. 1 at PageID #: 14; ECF No. 147-1 at PageID #: 1138-39, 1141.

The record reflects that the assault was, in fact, referred to the FBI for investigation, but the government declined prosecution.  ECF No. 143-1 at PageID #: 890.  Additionally, it is undisputed that, in 2008 and 2009, Lieutenant Butts did not have the authority unilaterally to release an inmate from his SHU placement.  ECF No. 148-1 at PageID #: 1192; ECF No. 149-1 at PageID #: 1245-46.  Plaintiff has abandoned both such theories of liability.  *See* ECF No. 156 (declining to argue either theory).  Plaintiff persists in his argument that Lieutenant Butts violated Plaintiff's Eighth Amendment right by failing to protect Plaintiff from Macari's premeditated attack.

### C.  Claim Against Captain Fitzgerald

Against Defendant Fitzgerald, a former Captain at FCI Elkton, Plaintiff asserts a claim of First Amendment retaliation.  He says that, on March 5, 2009, Captain Fitzgerald oversaw his placement in the SHU shortly after he had filed a grievance against prison staff alleging their failure to protect him from Macari's assault.  ECF No. 1 at PageID #: 14-15; ECF No. 147-1 at PageID #: 1118; *see* related case, Case No. 4:10-cv-307-BYP (N.D. Ohio), ECF No. 1-1 (filed Feb. 11, 2010).  In April 2009, during his SHU placement, Plaintiff alleges that Captain Fitzgerald yelled at him through his door: "You want to know why you're in here?  You're in here because of the fuckin' Tort Claim you filed!  That's why you're in here!"  ECF No. 1 (in this case) at PageID #: 15; ECF No. 147-1 at PageID #: 1132.  Plaintiff says he remained in the

(4:10cv2404)

SHU until May 4, 2009, for a period of 60 days.  ECF No. 1 at PageID #: 14; *see* ECF No. 147-1 at PageID #: 1138.

The Administrative Detention Order placing Plaintiff in the SHU noted, "You are being placed in the Administrative Detention [*sic*] for a Unit Team Threat assessment based on information received that there was a threat on to your safety based on your own statements." ECF No. 143-2 at PageID #: 909.  The Order is dated March 20, 2009, although accompanying documentation explains that Plaintiff was placed in the SHU 15 days prior, on March 5, 2009, pending investigation of his complaints about threats made by other inmates.  ECF No. 143-3 at PageID #: 911.

## II.  Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial."  *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact" to be resolved by the factfinder. *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). To defeat the motion, the non-moving party must "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

"The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). The fact under dispute must be "material," and the dispute itself must be "genuine." A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Scott*, 550 U.S. at 380. In determining whether a factual issue is "genuine," the Court assesses whether the evidence is such that a reasonable factfinder could find that the non-moving party is entitled to a verdict. *Id.*

### III. Analysis

#### A. Eighth Amendment Failure to Protect

Plaintiff's allegations against Defendants Simmons and Butts are predicated on the

(4:10cv2404)

Supreme Court's decision approving a *Bivens* remedy in *Farmer v. Brennan*, 511 U.S. 825 (1994). In *Farmer v. Brennan*, a prisoner-plaintiff sued federal prison officials for damages under *Bivens* alleging their failure to protect her from persistent beatings and rape by fellow inmates in violation of the Eighth Amendment. *Farmer*, 511 U.S. at 829-30. The Supreme Court vacated the district court's order granting summary judgment for the defendants in that case, and it discussed at length the Eighth Amendment "deliberate indifference" standard of liability for failure-to-protect claims. *Id.* at 832-47.

### 1. Defendant Simmons

Plaintiff argues that Defendant Simmons acted with deliberate indifference to Plaintiff's safety because, despite his awareness of Macari's threat to "smash a pedophile," he did not put himself in a position to prevent Macari's violent act. Defendants deny that Simmons had any awareness of a threat to Plaintiff, and they further deny that Simmons acted with deliberate indifference to anyone's safety on the day the attack took place. They argue there is no genuine dispute of material fact as to either point.

Plaintiff's claim relies on the premise that Defendant Simmons was aware of a "substantial risk of serious harm" to Plaintiff, *Farmer*, 511 U.S. at 828 (also *passim*), but it is undisputed that Simmons was never made aware of Macari's threat to "smash a pedophile." Plaintiff displays evidence that Macari had threatened to "smash a pedophile" if he was released into the general population, ECF No. 143-4 at PageID #: 915, and Plaintiff alleges without dispute that he was "reputedly . . . one of the biggest pedophiles on the Elkton compound," and thus a likely target of Macari's threat. ECF No. 1 at PageID #: 6. But Plaintiff points to no

7

(4:10cv2404)

evidence suggesting that Defendant Simmons, a line corrections officer at FCI Elkton, was actually apprised of Macari's threat. He does not posit that the threat was witnessed by or relayed to Simmons, nor that it was broadcast to all corrections officers, nor that Simmons likely would have learned of the threat during the course of his duties. In contrast, Defendant Simmons attests without dispute that, at the time the attack took place, he had never spoken with Plaintiff, and he was similarly unfamiliar with inmates Macari and Oberkramer. ECF No. 150-1 at PageID #: 1309.

For Defendant Simmons to be held liable, Plaintiff must show that Simmons "kn[ew] of and disregard[ed] an excessive risk to [Plaintiff's] . . . safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see id.* at 844 ("[P]rison officials who lacked knowledge of a risk cannot be said to have inflicted punishment . . . ."). Plaintiff's claim against Simmons fails out of the gate because Plaintiff points to no evidence showing that Simmons was "aware of facts" suggesting a "substantial risk of serious harm" to Plaintiff (or anyone else). There is no genuine dispute of material fact: Defendant Simmons was unaware of a threat to Plaintiff's safety, and there was therefore nothing for him to disregard. The Court of Appeals has already drawn a nearly identical conclusion with respect to (now-dismissed) Defendant Newland. ECF No. 17 at PageID #: 86 n.1 ("Without knowledge of [Macari's] threat," Newland's failure to take certain investigatory or protective measures "would at most support a finding of negligence rather than deliberate indifference.") (citing *Farmer*, 511 U.S. at 835).

(4:10cv2404)

Nevertheless, Plaintiff argues that Defendant Simmons disobeyed his Post Orders and

FCI Elkton policy, and that disobedience amounted to deliberate indifference to Plaintiff's safety.

The parties dispute whether Simmons violated his Post Orders[5] by smoking while supervising the

recall movement. Plaintiff says Simmons "could not have . . . searched inmates [as the Post

Orders instructed] with one hand [while] holding a cigarette in the other." ECF No. 156 at

PageID #: 1595. Inmate Macari assaulted Plaintiff with his hands and feet, not a contraband

weapon. A more vigilant search would not have helped protect Plaintiff. And in any event, the

suggestion that Simmons should not have been smoking during the recall movement sounds in

negligence, not deliberate indifference. The parties' dispute is perhaps genuine, but the disputed

fact is not material.

The parties also dispute whether Defendant Simmons violated his Post Orders by

standing "about a . . . foot and a half from the building . . . about ten feet away from the [inner]

door." ECF No. 147-1 at PageID #: 1037. Whether or not Simmons' physical positioning

resulted in noncompliance with those Post Orders,[6] however, Plaintiff does not endeavor to show

that the alleged noncompliance was itself anything more than "negligence, inadvertence, or good

faith error." *Reilly*, 680 F.3d at 624 (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

Plaintiff testified that it was common for officers, during recall movements, to stand "outside

_____

[5] The relevant Post Orders are docketed under seal. ECF No. 155-1.

[6] For his part, Defendant Simmons argues that he was in compliance with FCI Elkton
policy by standing just outside the building. He says he was, consistent with his Post Orders,
"bringing in inmates," preventing them from loitering during the movement. ECF No. 150-1 at
PageID #: 1303. Plaintiff also testified that Simmons was "watching everybody that was going
into the door." ECF No. 147-1 at PageID #: 1037.

smoking, like Simmons," or even "in their office." ECF No. 147-1 at PageID #: 1151. Again, the parties' dispute is genuine, but the disputed fact is not material.

Finally, Plaintiff argues that Defendant Simmons unconstitutionally failed to protect him by failing to intervene during Macari's attack despite inmates chanting in the stairwell, "fight! fight!" ECF No. 156 at PageID #: 1595. The parties agree that roughly 300 to 400 inmates were nearby, participating in the recall movement, ECF No. 142-1 at PageID #: 746 (citing ECF No. 147-1 at PageID #: 1028 ("probably 300 to 400"); ECF No. 150-1 at PageID #: 1304 ("it could be several hundred")), and that the area would have been noisy due to the commotion, ECF No. 147-1 at PageID #: 1040-41. Plaintiff says perhaps as many as 25 people were climbing the stairs,[7] another 10 were at the bottom of the stairwell, and "maybe 25 to 50" were in the immediate area outside the unit building where Simmons was standing. ECF No. 147-1 at PageID #: 1034. Plaintiff posits that Simmons must have heard the chanting, and his failure to intervene amounts to deliberate indifference to Plaintiff's safety. He urges that whether Simmons heard the "fight! fight!" chanting is a genuine issue of material fact that remains to be tried.

---

[7] Initially, when asked how many people were on the stairwell, Plaintiff answered, "On the stairs themselves . . . about 25 . . . ." ECF No. 147-1 at PageID #: 1034. When asked again shortly thereafter, he stated, "probably 20 [or] 25" inmates were behind him on the stairs during the assault, and "20 or 25" were in front of him as he was climbing up. Id. at PageID #: 1041. In argument, Plaintiff characterizes this testimony by asserting that "approximately 45 inmates" were present in the stairwell at once, all of whom witnessed Macari's attack and joined in the chanting. ECF No. 156 at PageID #: 1595. Plaintiff's testimony, however, reflects that only 20 to 25 inmates occupied the stairwell at any given time. When he started to climb the stairs, there were 20 to 25 inmates ahead of him, and when he reached the top, there were 20 to 25 inmates behind him.

Plaintiff's argument is too attenuated to withstand summary judgment. True, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," and knowledge of a risk may be proved by "inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. But Plaintiff's conclusion that the "substantial risk of serious harm" was "obvious" to Simmons cannot reasonably be drawn from the facts in the record. Plaintiff acknowledges that the recall movement was attended by significant commotion. ECF No. 147-1 at PageID #: 1028, 1040-41. He acknowledges that Defendant Simmons was standing outside the door and outside the sally port while the assault took place inside the building in the stairwell, and that another 25 to 50 inmates were still outside when the attack occurred. *Id.* at PageID #: 1037, 1034. He acknowledges that Simmons had trained his attention on the inmates entering the building, not on those whom had already entered the building. *Id.* at PageID #: 1037. He acknowledges that not all 20 or 25 inmates in the stairwell joined in the chanting; but rather, some were "trying to get out of there, so that they didn't get involved in it." *Id.* at PageID #: 1046. "At least some witnesses in the stairwell moved immediately to the dormitory unit." *Id.* On that evidence, Plaintiff cannot show that Defendant Simmons actually knew of a substantial risk to Plaintiff's safety when the attack took place. *See Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011) ("[A] prison official who was unaware of a substantial risk of harm to an inmate may not be held liable under the Eighth Amendment even if the risk was obvious and a reasonable prison official would have noticed it.") (citing *Farmer*, 511 U.S. at 841-42).

Moreover, even if the chanting was audible, it is not immediately obvious that the sound

of inmates chanting "fight! fight!" itself signifies a "substantial risk of serious harm" of constitutional magnitude. Even if a jury could find that Defendant Simmons actually heard the commotion in the stairwell, there is simply no evidence from which it could conclude that the risk to Plaintiff's safety was so obvious and so serious that Simmons' neglect to intervene amounted to a deliberate or reckless "unnecessary and wanton infliction of pain." *Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976)).

In addition, Plaintiff acknowledges that the assault lasted "a minute or two." ECF No. 147-1 at PageID #: 1026; *see* ECF No. 143-1 at PageID #: 194 ("[I]t was so fast that he didn't have anytime [*sic*] to yell or ask for help."). It would have taken a significant portion of that time for the chanting to reach fever pitch and for Simmons to recognize what was taking place. It would have taken additional time for Simmons to leave whatever task he was attending, move through the crowded sally port and up the stairs, and place himself between Macari and Plaintiff. Plaintiff analogizes to *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990), in which two prison officers were liable under the Eighth Amendment for failing to prevent one inmate from stabbing another to death. But in this case, Plaintiff does not argue that Defendant Simmons could have *prevented* Macari's violent beating, only that he could have stepped in to put a stop to a beating that had already begun and, very likely, nearly finished.

And it is undisputed that Defendant Simmons acted reasonably and appropriately to ensure Plaintiff's safety after the attack concluded. Simmons ensured that Plaintiff was secluded, reported the assault to his superior, locked down the unit, and took Plaintiff to the Lieutenant's

(4:10cv2404)

office for a physical examination and a statement.  ECF No. 143-1 at PageID #: 892; ECF No. 150-1 at PageID #: 1304-05.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844.

On the evidence advanced, as to Defendant Simmons, Plaintiff cannot make out a claim of deliberate indifference under the Eighth Amendment.  Summary judgment is granted in favor of Defendant Simmons.

### 2.  Defendant Butts

Plaintiff has abandoned his allegations pertaining to Defendant Butts' supposed obligation to refer Macari's attack to the FBI for prosecution and to release Plaintiff from his placement in the SHU.  He persists in his allegation that Butts unconstitutionally failed to protect Plaintiff from Macari's premeditated attack.

Unlike with his allegations pertaining to Defendant Simmons, Plaintiff advances evidence that Defendant Butts personally was made aware of Macari's threat to "smash a pedophile."  Because Macari made the threat to prevent his release from the SHU, and because Butts was obligated "to sign a release for every inmate released from the SHU," Plaintiff supposes that Butts necessarily would have been apprised of Macari's threat, however nonspecific, prior to authorizing the latter's release into the general population.  ECF No. 156 at PageID #: 1597 (citing ECF No. 155-3 at PageID #: 1524).

Plaintiff's argument, however, goes no further.  He does not detail which of Defendant Butts' acts or omissions supposedly amounted to deliberate indifference.  He advances no

evidence or argument suggesting that Butts' apparent decision to recommend or approve

Macari's release was anything less than a careful conclusion based on thoughtful consideration.

Plaintiff does not dispute that the decision to release Macari ultimately would have been reached

by multiple officers, and Defendant Butts would have had respected input but not unilateral

authority to decide Macari's housing placement.  ECF No. 155-3 at PageID #: 1524 (SHU Post

Orders); *see* ECF No. 148-1 at PageID #: 1191-92 (Butts deposition testimony); ECF No. 149-1

at PageID #: 1245-46 (Fitzgerald deposition testimony).

At most, then, Plaintiff's argument (both in his Complaint and in his opposition to

summary judgment) reduces to an unexplained suggestion that Defendant Butts should have

reasoned differently than he did and drawn a different conclusion about the appropriateness of

Macari's release from the SHU.  As a matter of law, such a suggestion cannot satisfy Plaintiff's

obligation to show that Butts' actions or omissions amounted to a deliberate or reckless

"unnecessary and wanton infliction of pain." *Reilly*, 680 F.3d at 624 (quoting *Estelle*, 429 U.S.

at 102-03).

"[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual

Punishments Clause." *Farmer*, 511 U.S. at 845.  And Plaintiff does not dispute the evidence that

Butts' conclusion about Macari's housing placement was reasonable.  *See* ECF No. 148-1 at

PageID #: 1211 (Defendant Butts: "[I]nmates say they're going to assault sex offenders all the

time.  My experience in 34 years of corrections, inmates say he's going to do something, he's

normally not going to do it.  If an inmate wants to do something, he won't say anything about

it."); ECF No. 142-11 at PageID #: 886 (Unit Manager Jason Streeval: "[T]alking about violence

against pedophiles is a posturing that many inmates take. . . . A statement or threat that an inmate

intended to harm a pedophile, without more specific identifying information, usually does not

always allow staff to gauge the actual intent or seriousness of an inmate making such a statement.

Staff rely on their experience and judgment to gauge the nature and severity of a threat . . . .");

ECF No. 149-1 at PageID #: 1257-58 ("Most inmates [at FCI Elkton] are either nonviolent or

have been doing so much time that they're down to    they're getting out soon.  They see the light

at the end of the tunnel.  So mixing [sex-offender inmates and non-sex-offender inmates], we

don't see it as a problem . . . .").

        Even if Defendant Butts was made aware of Macari's nonspecific threat to "smash a

pedophile," there is no genuine dispute that Butts acted reasonably in response.  Summary

judgment is granted in favor of Defendant Butts.

    **B.  First Amendment Retaliation**

        Defendants argue that, since the Supreme Court's 2017 decision in *Ziglar v. Abbasi*, 137

S.Ct. 1843 (2017), a *Bivens* action can no longer be sustained for a claim of First Amendment

retaliation by a prisoner.  ECF No. 142-1 at PageID #: 731-41.  In their reply brief, they also posit

that, even if a cause of action exists under *Bivens*, summary judgment nevertheless should be

granted as to Defendant Fitzgerald because she was endowed with qualified immunity for her

actions and because "Plaintiff would have been placed in SHU in 2009 regardless of any alleged

protected activity."  ECF No. 163 at PageID #: 1647-48.  Because they were first advanced in a

reply brief, the latter two arguments are waived for purposes of this motion.  *See United States v.*

*Abboud*, 438 F.3d 554, 589 (6th Cir. 2006).  The Court addresses the narrow question whether a

(4:10cv2404)

*Bivens* claim alleging First Amendment retaliation may be sustained in light of the Supreme

Court's decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).

### 1. Pre-*Abbasi* Circuit Precedent

Prior to *Abbasi*, Plaintiff's First Amendment retaliation claim would have been squarely

governed by Sixth Circuit precedent in *Hill v. Lappin*, 630 F.3d 468 (6th Cir. 2010). In *Hill*, the

Court of Appeals clarified that First Amendment retaliation claims for damages could proceed

against federal officers on the authority of *Bivens*. Quoting the Supreme Court's decision in *Butz*

*v. Economou*, 438 U.S. 478 (1978), the court emphasized that, "'without congressional directions

to the contrary,' it would 'stand the constitutional design on its head' if federal officials were not

liable for constitutional violations through *Bivens* actions to the same extent as state officials are

through [42 U.S.C.] § 1983 actions." *Hill*, 630 F.3d at 471 (quoting *Butz*, 438 U.S. at 504). In

the Sixth Circuit, a plaintiff may plead a § 1983 claim based on First Amendment retaliation

against a state officer pursuant to *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (*en banc*).

In *Abbasi*, however, the Supreme Court appeared to abrogate a large swath of circuit

precedent pertaining to *Bivens* actions. *See Abbasi*, 137 S. Ct. at 1859 ("The proper test for

determining whether a case presents a new *Bivens* context is as follows. If the case is different in

a meaningful way from previous *Bivens* cases decided by this Court, then the context is new" and

must be tested afresh). Even so, at least two district courts have suggested that pre-*Abbasi* circuit

(4:10cv2404)

precedent may still be cited with authority. *See* Jerra v. United States, 2018 WL 1605563, at *4 (C.D. Cal. Mar. 29, 2018); Loumiet v. United States, 292 F. Supp. 3d 222, 229 (D.D.C. 2017).[8] If those suggestions are correct, then *Hill* dictates recognition of a *Bivens* remedy in this case.

But the Supreme Court's language in *Abbasi* cannot bear such a reading. The Court in *Abbasi* listed and explained three prior scenarios in which it had entertained and approved a damages remedy for constitutional tort claims against federal officers. Abbasi, 137 S. Ct. at 1854-55, 1859 (citing Bivens, 403 U.S. 388 (1971); Davis v. Passman, 442 U.S. 228 (1979); Carlson v. Green, 446 U.S. 14 (1980)). *Bivens* allowed a damages remedy for an unlawful search in violation of the Fourth Amendment; *Davis* for a discriminatory employment decision by a Congressman in violation of the Fifth Amendment; and *Carlson* for deliberate indifference to a prisoner's serious medical need in violation of the Eighth Amendment. "These three cases — *Bivens*, *Davis*, and *Carlson* — represent the only instances in which the [Supreme] Court has approved of an implied damages remedy under the Constitution itself."[9] Id. at 1855. If a constitutional tort claim for damages against a federal officer does not closely match the circumstances of one of those cases, the Court said, "then the context is new," and the claim may not go forward without additional scrutiny. Id. at 1859.

---

[8] Neither the *Jerra* court nor the *Loumiet* court relied on pre-*Abbasi* circuit precedent in reaching its conclusion about the availability of a *Bivens* remedy.

[9] Despite its absence from the list in *Abbasi*, the Supreme Court has also recognized a *Bivens* remedy under the Eighth Amendment for failure to protect a plaintiff's safety in the prison setting. Farmer, 511 U.S. 825 (1994); *see* Bistrian v. Levi, 912 F.3d 79, 91 (3d Cir. 2018) ("It seems clear, then, that the Supreme Court has, pursuant to *Bivens*, recognized a failure-to-protect claim under the Eighth Amendment.") (citation and footnote omitted).

*Hill*, therefore, while not directly overturned, must be reexamined in light of *Abbasi*. *See* *Vanderklok v. United States*, 868 F.3d 189, 199 (3d Cir. 2017) ("Our past pronouncements" pertaining to *Bivens* remedies "are thus not controlling in the specific circumstances now at issue.").

### 2. Circuit and District Court Decisions Since *Abbasi*

Since *Abbasi* was decided, one circuit court has explicitly rejected the theory that First Amendment retaliation claims by prisoners or pretrial detainees may be brought under *Bivens*. *Bistrian v. Levi*, 912 F.3d 79, 96 (3d Cir. 2018) ("We . . . conclude that the special factors analysis prevents an extension of *Bivens* to cover [First Amendment retaliation] claims" brought by federal prisoners.). Three other circuit courts have assumed without deciding that a *Bivens* action is available for claims of First Amendment retaliation by a federal officer. *Bouchard v. Olmstead*, 775 F. App'x 701, 703 (2d Cir. May 30, 2019) ("assuming without deciding") (unpublished); *Butts v. Martin*, 877 F.3d 571, 589 (5th Cir. 2017) ("[W]hether *Bivens* extends to First Amendment retaliation claims remains inconclusive.") (citation omitted); *Brunson v. Nichols*, 875 F.3d 275, 279 n.3 (5th Cir. 2017) ("A First Amendment claim is likely a new context."); *Krug v. Pellicane*, 703 F. App'x 558 (9th Cir. 2017) ("[a]ssuming without deciding") (unpublished). The Sixth Circuit has not spoken on the issue.

Within the Sixth Circuit, four district-court decisions discuss the availability of a *Bivens*

(4:10cv2404)

remedy for a federal prisoner alleging First Amendment retaliation. *Edgerson v. West*, 2019 WL 2291479, at \*2-3 (W.D. Tenn. May 29, 2019) (Todd, J.); *Doyle v. United States*, 2018 WL 5986738, at \*7-10 (E.D. Ky. Nov. 13, 2018) (Reeves, J.); *Howard v. Lackey*, 2018 WL 1211113, at \*3-4 (E.D. Ky. Mar. 7, 2018) (Caldwell, J.); *Goddard v. Alexakos*, 2018 WL 1168611, at \*12-13 (E.D. Ky. Mar. 6, 2018) (Caldwell, J.). Of those four decisions, three conclude and one strongly suggests that a *Bivens* remedy is not available for claims of First Amendment retaliation by federal prisoners.[10]

Outside the Sixth Circuit, at least two district courts have permitted a *Bivens* claim based on First Amendment retaliation to proceed, *Jerra*, 2018 WL 1605563, at \*3-6; *Loumiet*, 292 F. Supp. 3d at 225, and another has declined to dismiss the matter on initial screening, *Burgett v. Puckett*, 2018 WL 4409948, at \*2 (S.D. Ill. Sept. 17, 2018). The plaintiffs in *Jerra* and *Burgett* were prisoners in federal custody. The plaintiff in *Loumiet* was not incarcerated; he was an attorney who alleged retaliatory prosecution as unlawful punishment for protected speech. The courts in *Jerra* and *Loumiet* acknowledged that, since *Abbasi*, the plaintiffs' claims arose in a "new context," but both concluded that there were no "special factors counseling hesitation" in identifying an implied right of action in the First Amendment to the Constitution.

The strong trend, however, goes the opposite direction. "Nationwide, district courts seem to be in agreement that, post *Abbasi*, prisoners have no right to bring a *Bivens* action for violation

_____

[10] The courts in *Edgerson*, *Doyle*, and *Howard* frame that conclusion as a holding; in *Goddard* the court declines to answer the question with certainty.

(4:10cv2404)

of the First Amendment." *Free v. Peikar*, 2018 WL 1569030, at *2 (E.D. Cal. Mar. 30, 2018) (collecting cases); *see also, e.g.*, *Atkinson v. Broe*, 2019 WL 231754 (W.D. Wis. Jan. 16, 2019); *Cox v. True*, 2018 WL 6928796 (S.D. Ill. Sept. 20, 2018) (Wilkerson, M.J.), report and recommendation adopted at 2019 WL 95478 (Jan. 3, 2019); *Early v. Shepherd*, 2018 WL 4539230 (S.D. Ind. Sept. 21, 2018); *Akande v. Philips*, 2018 WL 3425009 (W.D.N.Y. July 11, 2018); *Johnson v. Johnson*, 2018 WL 4374231 (S.D.W.V. June 5, 2018); *Reid v. United States*, 2018 WL 1588264 (E.D. Cal. Apr. 2, 2018); *Gonzalez v. Bendt*, 2018 WL 1524752 (D.S.D. Mar. 28, 2018); *Andrews v. Miner*, 301 F. Supp. 3d 1128 (N.D. Ala. Aug. 25, 2017).

### 3. *Abbasi* Analysis

The Supreme Court has only found that a *Bivens* action lies in a few distinct cases. *Abbasi*, 137 S. Ct. at 1854-55, 1859 (citing *Bivens*, 403 U.S. 388 (1971); *Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980)). Any such claim that is not squarely on point with *Bivens*, *Davis*, or *Carlson* arises in a "new context." A court should not infer a private right of action for damages in a "new context" if there exist "special factors counseling hesitation" in doing so. *See generally Abbasi*, 137 S. Ct. 1843.

### a. New Context

As discussed above, the Supreme Court in *Abbasi* made clear that the "new context" analysis should be performed with reference to Supreme Court case law, not pre-*Abbasi* circuit precedent. "The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court, then the context is new." *Abbasi*, 137 S. Ct. at 1859.

(4:10cv2404)

Plaintiff's First Amendment retaliation claim is not located squarely within a Supreme Court *Bivens* precedent, and pre-*Abbasi* circuit precedent can no longer establish a recognized *Bivens* context. Accordingly, Plaintiff's claim arises in a "new context," and the Court must assess whether there are any "special factors counseling hesitation" before inferring the availability of a *Bivens* remedy.

### b. Alternative Remedies

The first "special factor" to be considered is whether some alternative remedy exists to vindicate the right at issue. *Abbasi*, 137 S. Ct. at 1858 ("[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."); *Carlson*, 446 U.S. at 18-19 (an "equally effective" "alternative remedy" might foreclose a *Bivens* action). Defendants suggest that three remedial schemes exist to vindicate Plaintiff's First Amendment claims. In assessing these arguments, the Court asks whether Plaintiff has presented a case in which "it is damages or nothing." *Id.* at 1862 (quoting *Bivens*, 403 U.S. at 410 (Harlan, J., concurring in judgment)).

Defendants first posit that the Prison Litigation Reform Act ("PLRA") grievance procedure is an adequate alternative remedial structure. ECF No. 142-1 at PageID #: 735-37; *see Abbasi*, 137 S. Ct. at 1858. The existence of the PLRA grievance procedure, however, does not altogether preempt *Bivens* actions in the prison setting. The Court in *Abbasi* condoned the continued pursuit of *Carlson* claims challenging conditions of confinement despite acknowledging that a plaintiff making such a claim today would be obligated first to exhaust the

administrative remedies made available by that grievance procedure. *See Abbasi*, 137 S. Ct. at 1865. And the same is true of Plaintiff's Eighth Amendment *Bivens* claims for failure to protect against Defendants Simmons and Butts, but Defendants do not suggest that the PLRA grievance procedure forecloses a *Bivens* remedy in that context either.

Rather, it seems that, from its inception, the PLRA grievance procedure was meant as a prelude to *Bivens* litigation, not a substitute for it. In *Abbasi*, the Court observed that the PLRA's "exhaustion provisions . . . apply to *Bivens* suits." *Id.* (citing dicta in *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). As the Third Circuit observed in *Bistrian*, "[t]he very statute that regulates how *Bivens* actions are brought cannot rightly be seen as dictating that a *Bivens* cause of action should not exist at all." *Bistrian*, 912 F.3d at 93. Instead, the grievance-procedure exhaustion requirement has served to reduce the quantity of frivolous lawsuits and improve the quality of those that persist. *See id.* at 93 n.22 ("It is . . . likely . . . that Congress simply wanted to reduce the volume of prisoner suits by imposing exhaustion requirements, rather to [*sic*] eliminate whole categories of claims through silence and implication.").

Even if, in the abstract, the existence of a grievance procedure is a special factor counseling against inferring a private right of action under *Bivens*, the facts of this particular case place such a conclusion out of reach. The Court of Appeals, at an earlier stage of these proceedings, identified a genuine dispute of material fact about whether the grievance procedure was meaningfully available to Plaintiff at all.[11] And Defendants do not dispute, for purposes of

---

[11] Specifically, the Court of Appeals recited Plaintiff's allegation "that Captain Fitzgerald told him that if [Plaintiff] continued with his grievances regarding the attack, '[she would] personally see that [Plaintiff was] transferred to a penitentiary and [he would] more than likely be

this motion, that Plaintiff was intimidated out of meaningfully accessing the prison grievance procedure. Defendants argue that, even if administrative remedies were not made available to Plaintiff specifically, his claim nevertheless should not be allowed to persist because an administrative-remedy process exists for prisoners generally. ECF No. 142-1 at PageID #: 736-37.

That position is difficult to stomach and by no means necessary. An officer-defendant cannot actively obstruct a prisoner's access to a grievance procedure, then invoke the availability of that same grievance procedure to argue that no cause of action should exist at all. The Court of Appeals has already concluded that Plaintiff's failure to exhaust administrative remedies should not be held against him at this stage. ECF No. 68 at PageID #: 503-05. Moreover, the Sixth Circuit emphasized that if the allegations about Defendant Fitzgerald's retaliatory conduct are true, the BOP grievance remedy was not available to Plaintiff. *See id.* at 505. ("In our view, this retaliation and intimidation if proven true would render the grievance process functionally unavailable for a person of ordinary firmness."). The cornerstone of an adequate, alternative remedy foreclosing a *Bivens* action is that the remedy is actually available to the harmed individual. *See Wilkie v. Robbins,* 551 U.S. 537, 551 (2007) (noting that *Bivens* was not cognizable because plaintiff had "the means to be heard"); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 72 (2001) ("Nor are we confronted with a situation in which claimants in respondent's shoes lack effective remedies"); *Bush v. Lucas*, 462 U.S. 367, 368 (1983) (finding a *Bivens*

---

attacked and not just beat up.' When [Plaintiff] filed his FTCA lawsuit, he claimed that Captain Fitzgerald followed through with her threats and placed him in the Special Housing Unit." ECF No. 68 at PageID #: 504 (citing ECF No. 47 at PageID #: 275).

action was foreclosed because the plaintiff had "meaningful remedies"); *Carlson*, 446 U.S. at 18-19 (the existence of an "equally effective" alternative remedy may foreclose a *Bivens* remedy). It would be senseless to conclude that Plaintiff's claim should nevertheless be dismissed because those administrative remedies, unavailable to him, were adequate to provide the relief he sought. *See Jerra*, 2018 WL 1605563, at *5 (also concluding that the PLRA grievance procedure could not foreclose a *Bivens* action if the procedure was not accessible to the plaintiff); *Turkmen v. Ashcroft*, 2018 WL 4026734, at *11-12 (E.D.N.Y. Aug. 13, 2018) (report and recommendation, still pending) (recommending the conclusion that the Bureau of Prisons grievance procedure could not foreclose a *Bivens* action because it was not meaningfully available to the plaintiffs).

On the facts alleged, the Court cannot conclude that the existence of a prison grievance procedure counsels hesitation in inferring a *Bivens* cause of action.

Second, Defendants argue that Plaintiff could have sought relief through a petition for a writ of habeas corpus, apparently pursuant to 28 U.S.C. § 2241. Although a similar suggestion was made in *Abbasi* (in which the plaintiffs challenged the conditions of their confinement), the Supreme Court went out of its way in that case to explain that the suggestion was novel and the legal theory was apparently untested. *Abbasi*, 137 S. Ct. at 1862-63 ("[I]n addition to [injunctive relief], we have left open the question whether [detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus. . . .").[12] It is unpersuasive to

---

[12] The Court in *Abbasi* cited two other cases indicating that the viability of a habeas petition under Plaintiff's circumstances was uncertain. *Abbasi*, 137 S. Ct. at 1863 (citing *Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety

24

argue that habeas corpus provides an adequate remedial structure for a prisoner's complaint about conditions of confinement while also admitting that the viability of such a petition is, at best, "arguable." ECF No. 142-1 at PageID #: 737 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("[I]t is arguable that habeas corpus will lie to remove the restraints making the custody illegal.")).

More importantly, however, Defendants' argument about habeas corpus mischaracterizes the right that Plaintiff seeks to vindicate in his First Amendment claim. Even if a writ of habeas corpus could have liberated Plaintiff from the tangible *consequences* of the alleged retaliation, it would not itself have cured the intangible First Amendment injury he endured the moment he was punished for engaging in protected activity. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) ("An inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf.") (citation omitted).

Defendants posit that Plaintiff's First Amendment claim "is, at its core, a claim that challenges his housing assignment." ECF No. 163 at PageID #: 1645. It is true that Plaintiff's claim includes as an element his discontentment with his temporary placement in the SHU. The right he seeks to vindicate, however, is not a right to any particular housing assignment but rather the right to file a grievance on his own behalf free from any consequent punishment. *See Thaddeus-X*, 175 F.3d at 394 ("[R]etaliation for the exercise of constitutional rights is itself a

---

of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal.").

(4:10cv2404)

violation of the Constitution.") (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998));

*Herron*, 203 F.3d at 415 (affirming an inmate's "undisputed First Amendment right to file

grievances against prison officials").

      The distinction makes a difference. "The loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S.

347, 373 (1976) (plurality opinion) (citation and footnote omitted); *see Jones v. Caruso*, 569 F.3d

258, 277 (6th Cir. 2009) (quoting *Elrod,* 427 U.S. at 347); *G & V Lounge, Inc. v. Mich. Liquor

Control Comm'n*, 23 F.3d 1071, 1078-79 (6th Cir. 1994) ("[E]ven minimal infringement upon

First Amendment values constitutes irreparable injury . . . .") (quoting *Newsom v. Norris*, 888

F.2d 371, 378 (6th Cir. 1989)); *see also* Marissa C.M. Doran, Note, *Lawsuits as Information:

Prisons, Courts, and a Troika Model of Petition Harms*, 122 Yale L.J. 1024, 1047-48, 1047

n.108 (2013) ("[I]njuries [resulting from grievance retaliation] are not by themselves

psychological or physical, but rather 'inhere in the retaliatory conduct itself.'") (quoting *Dixon v.

Brown*, 38 F.3d 379, 379 (8th Cir. 1994) (alteration omitted)). Just as a habeas writ cannot

redress an injury arising from a failure to protect, it also cannot redress unlawful punishment for

protected First Amendment activity "because it . . . gives no retrospective relief." *Bistrian*, 912

F.3d at 92 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973) (observing that habeas relief

does not provide for damages)). "In situations of abuse of office, an action for damages may

offer the only realistic avenue for vindication of constitutional guarantees." *Crawford-El v.

Britton*, 523 U.S. 574, 591 (1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)).

      Defendants finally suggest that the Federal Tort Claims Act ("FTCA") should foreclose

26

the availability of a *Bivens* action.[13]  This position has been flatly rejected by the Supreme Court.

"[T]he *Bivens* remedy . . . is a more effective deterrent than the FTCA" because it "is recoverable

against individuals . . . ." *Carlson*, 446 U.S. at 21.  In holding that a *Bivens* action was available

for prisoners to challenge their conditions of confinement, the Court went on to say that the

"FTCA is not a sufficient protector of the citizens' constitutional rights, and without a clear

congressional mandate we cannot hold that Congress relegated [prisoners] exclusively to the

FTCA remedy."  *Id.* at 23.  "[T]he congressional comments accompanying [a 1974] amendment

[to the FTCA] made it crystal clear that Congress views FTCA and *Bivens* as parallel,

complementary causes of action . . . ."  *Id.* at 19-20.  It is "'crystal clear' that Congress intended

the FTCA and *Bivens* to serve as 'parallel' and 'complementary' sources of liability."  *Malesko*,

534 U.S. at 68 (quoting *Carlson*, 446 U.S. at 19-20).

　　　The Third Circuit observed in *Bistrian* that "the FTCA itself appears to recognize the

complementary existence of *Bivens* actions by creating an exception for suits against individual

federal officers for constitutional violations."  912 F.3d at 92 (citing *Vanderklok v. United States*,

868 F.3d 189, 201 (3d Cir. 2017), and 28 U.S.C. § 2679(b)(2)(A)).  Indeed, by its terms, the

FTCA "does not extend or apply to a civil action against an employee of the Government . . .

which is brought for a violation of the Constitution of the United States."  28 U.S.C. §

2679(b)(2)(A).

---

[13] Defendants assert that "courts around the country have determined that an inmate's
ability to file a claim under the Federal Tort Claims Act is an alternative, existing process
counseling hesitation in extending a *Bivens* remedy . . . ."  ECF No. 142-1 at PageID #: 737.  In
support, they cite two district-court orders, both issued by the same district judge in the Southern
District of Indiana.  *Id.*

(4:10cv2404)

Plaintiff's claim stands in stark contrast to those advanced in *Abbasi*.  In *Abbasi*, the plaintiffs broadly contended that the conditions of their pretrial confinement were abusive and violative of due process.  *Abbasi*, 137 S. Ct. at 1853-54.  In the *Abbasi* Court's assessment, the plaintiffs' grievances could have been remedied through an injunction, and Plaintiffs did not need to resort to *Bivens* to secure meaningful redress.  *Id.* at 1862 ("To address those kinds of [policy] decisions, detainees may seek injunctive relief.").  By contrast, and of special note in this case, the Court observed that "individual instances of discrimination or law enforcement overreach . . . due to their very nature are difficult to address except by way of damages actions after the fact."  *Id.*  In this case, Plaintiff seeks relief for an individual instance of law enforcement overreach, namely, retaliatory punishment for First Amendment protected activity in a particular time and place.  For such a case, at least when administrative remedies are unavailable, "it is damages or nothing."  *Id.* (quoting *Bivens*, 403 U.S. at 410 (Harlan, J., concurring in judgment)).

### c.  Other Special Factors Counseling Hesitation

This final portion of the *Abbasi* inquiry "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."  *Abbasi*, 137 S. Ct. at 1857-58.  Put differently, the court should ask whether "Congress would want the Judiciary to interfere."  *Id.* at 1858.  Apart from the availability of alternative remedies, the Court in *Abbasi* addressed three "special factors" that might cause a court not to infer a cause of action under *Bivens*.  *Id.* at 1860-63.  The Court explained, however, that its list of special factors was not exhaustive.  *Id.* at 1857

(4:10cv2404)

(courts should appraise "a host of considerations").

      *Abbasi*'s first, and plainly most pressing, concern with inferring a *Bivens* action for the plaintiffs' claims was the following: "[A] *Bivens* action is not 'a proper vehicle for altering an entity's policy.'" *Id.* at 1860 (quoting *Malesko*, 534 U.S. at 74). The named defendants discussed in this portion of the *Abbasi* opinion were high ranking officers in the Executive Branch, specifically the former United States Attorney General John Ashcroft, the former FBI Director Robert Mueller, and the former Immigration and Naturalization Service Commissioner James Ziglar.[14] *Id.* at 1853. In the Court's perception, the *Abbasi* plaintiffs sought to litigate the propriety not of individual prison officers' actions but rather the "sensitive functions of the Executive Branch." *Id.* at 1861 (citation omitted). Such a course of litigation "would necessarily require inquiry and discovery into the whole course of the discussions and deliberations that led to the policies and governmental acts being challenged," and the Court expressed concern that such events "could inhibit the free flow of advice, including analysis, reports, and expression of opinion within an agency." *Id.* (quoting *Fed. Open Market Comm. v. Merrill*, 443 U.S. 340, 360 (1979). By contrast, the Court emphasized that "[t]he purpose of *Bivens* is to deter the *officer*," *id.* at 1860, and "individual instances of discrimination or law enforcement overreach . . . due to their very nature are difficult to address except by way of damages actions after the fact." *Id.* at 1862.

      It is important to note that Plaintiff alleges an *individual instance of law enforcement*

---

[14] The plaintiffs also pressed claims against the warden and the assistant warden of the facility where they were detained. *Abbasi*, 137 S. Ct. at 1853.

*overreach*.  His claim does not challenge the policies of FCI Elkton or the Bureau of Prisons

more broadly; indeed, Plaintiff's claim largely centers on the allegation that Defendant Fitzgerald

*ignored* the policy that was in place.  ECF No. 1 at PageID #: 13-14.  The *Abbasi* Court's

hesitation to engage with general prison policy has no application here.

    *Abbasi*'s second "special factor" pertains to sensitive matters of national security.  *See id.*
*at 1861-62*.  The plaintiffs in *Abbasi* were alien detainees who were held on immigration

violations in the wake of the September 11, 2001, terrorist attacks, and they challenged "major

elements of the Government's whole response to the September 11 attacks . . . ."  *Id.* at 1861.

The Court emphasized that "courts have shown deference to what the Executive Branch 'has

determined . . . is essential to national security.' . . . Indeed, 'courts traditionally have been

reluctant to intrude upon the authority of the Executive in military and national security affairs'

unless 'Congress specifically has provided otherwise.'"  *Id.* (quoting *Winter v. Nat. Res. Def.*
*Council, Inc.*, 555 U.S. 7, 24, 26 (2008), and *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988)).

    The *Abbasi* Court's hesitation to engage with national-security policy has no application

to this case.  Whereas the claims in *Abbasi* challenged "detention policy," the claims in this case

challenge "standard 'law enforcement operations'" of the sort ordinarily amenable to claims for

damages.  *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990)).

    Third, the Court in *Abbasi* identified congressional silence on the relevant policy area as a

special factor that might counsel hesitation in inferring a *Bivens* cause of action.  *Id.* at 1862.  "In

the almost 16 years since September 11," the Court stated, "the Federal Government's responses

to that terrorist attack have been well documented.  Congressional interest has been 'frequent and

intense,' and some of that interest has been directed to the conditions of confinement at issue [in *Abbasi*]." *Id.* (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988)). The Court continued, "This silence is notable because it is likely that high-level policies will attract the attention of Congress. Thus, when Congress fails to provide a damages remedy in circumstances like these, it is much more difficult to believe that 'congressional inaction' was 'inadvertent.'" *Id.* (quoting *Schweiker*, 487 U.S. at 423).

The same cannot be said in this case. Whereas pretrial detention of suspected terrorists in the aftermath of the September 11 attacks and the conditions of their confinement were the focus of intense legislative attention, Congress apparently has not had any reason to zero in on particular allegations of retaliation in response to particular grievance filings at particular correctional institutions. Unlike in *Abbasi*, it is not at all "difficult to believe that congressional inaction" on Plaintiff's claim "was inadvertent." *Id.* (quotation marks and citation omitted).

And as discussed above, the existence of the PLRA grievance procedure and exhaustion requirements do not alone suggest preemption of *Bivens* claims by prisoners. "Some 15 years after *Carlson* was decided, Congress passed the [PLRA], which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs." *Id.* at 1865. Armed with the awareness that the *Bivens* remedy had been made available to federal prisoners through *Carlson* and *Farmer*, Congress chose to regulate such lawsuits (by creating a grievance procedure and imposing an exhaustion requirement) rather than eliminate them. *Id.* (PLRA exhaustion requirement applies to *Bivens* lawsuits). It is not

sensible to read Congress' "silence" with respect to the availability of damages as a dramatic reversal of the status quo in that respect. *Abbasi* does not hold otherwise.[15]

None of *Abbasi*'s special factors apply to Plaintiff's claim. Defendants, however, suggest one additional "special factor" not addressed, or perhaps only tangentially addressed, in *Abbasi*. They state, in summary, that the Executive Branch is endowed with a great deal of discretion in carrying out the tasks of prison administration. ECF No. 142-1 at PageID #: 739-40. They cite and quote from numerous cases articulating their position; for example, *Turner v. Safley*, 482 U.S. 78, 84-85 (1987) ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."), and *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976) (observing that "the day-to-day functioning of . . . prisons" and certain "discretionary decisions" are "not the business of federal judges").

The Court registers no objection to the principle that, generally speaking, prison officers have a great deal of discretion in deciding how to carry out their tasks. That general principle, however, does not "cause [the] court to hesitate" before "allowing a damages action to proceed." *See Abbasi*, 137 S. Ct. at 1858. *Abbasi* itself suggests the opposite conclusion: Judicial caution with respect to reviewing prison-guard conduct, standing alone, is not sufficient to foreclose a *Bivens* remedy. If it were, that would have been all the *Abbasi* Court had needed to say when

---

[15] "[T]he [PLRA] itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Abbasi*, 137 S. Ct. at 1865 (emphasis added). An acknowledgment that a given position "could be argued" is hardly an authoritative adoption of that position.

considering the claims against the prison warden in that case. *See id*. at 1864-65. Instead,

despite the fact that the claims arose in a prison setting in which the warden undoubtedly was

tasked with countless "difficult but necessary decisions" about prison administration, *cf. id*. at

1861, the Court did not decide the special-factors question as a matter of law. Rather, the

question whether any "special factors" counseled hesitation in inferring a *Bivens* action was

remanded to the Court of Appeals to address in the first instance.[16] *Id*. at 1865 (Kennedy, J.,

plurality opinion);[17] *id*. at 1869 (judgment, vacating and remanding). If the general principle of

operational discretion for prison officers were sufficient by itself to foreclose a *Bivens* remedy,

*Abbasi* would have been decided in its entirety on the spot, not remanded for further

consideration.

It is for good reason that prison officers' discretion does not, by itself, counsel hesitation

in inferring a *Bivens* remedy. The doctrine of qualified immunity already takes account of

"discretionary functions" performed in an officer's official capacity. *Anderson v. Creighton*, 483

*U.S. 635, 638 (1987)*. The doctrine of qualified immunity "shield[s] [officers] from civil

damages liability as long as their actions could reasonably have been thought consistent with the

---

[16] The warden's renewed motion to dismiss is still being actively litigated before the district court. *Turkmen v. Ashcroft*, Case No. 1:02-cv-2307-DLI-SMG (E.D.N.Y.), ECF No. 808 and related docket entries.

[17] Of the Justices in the majority, with respect to the claims against the warden, only Justice Thomas would have reversed without remanding to the court of appeals for a special-factors assessment in the first instance. Justice Thomas explained that he would have preferred to limit the availability of *Bivens* actions to the "precise circumstances" of "*Bivens* and its progeny . . . " *Abbasi*, 137 S. Ct. at 1869-70 (Thomas, J., concurring in judgment) (quoting *Wilkie v. Robbins*, 551 U.S. 537, 568 (2007) (Thomas, J., concurring)), thereby obviating the need for any special-factors assessment when a *Bivens* claim arises in a "new context."

(4:10cv2404)

rights they are alleged to have violated." *Id.; see Malley v. Briggs*, 475 U.S. 335, 341 (1986)

(qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

law"); *Carlson*, 446 U.S. at 19 ("[E]ven if requiring them to defend respondent's suit might

inhibit their efforts to perform their official duties, the qualified immunity accorded [to the

defendant-officers] under *Butz v. Economou* provides adequate protection.") (citations omitted).

To enhance the effect of qualified immunity so as to completely foreclose potential constitutional

tort liability would belie the label of the immunity doctrine itself    such immunity would be

*unqualified*.

Defendants understand this, and they appropriately rely on a qualified immunity defense

with respect to the Eighth Amendment claims against Defendants Simmons and Butts. ECF No.

142-1 at PageID #: 741-51. And although the Court deems the argument waived for purposes of

this motion, *see above*, Defendant Fitzgerald has already demonstrated her ability and

willingness to argue that she, too, is entitled to qualified immunity with respect to the allegation

against her. *See* ECF No. 163 at PageID #: 1647-48.

Given *Abbasi*'s direction and the availability of a qualified immunity defense, the Court

cannot conclude that a general principle of judicial caution respecting officers' discretion

counsels hesitation in inferring a *Bivens* remedy for Plaintiff's First Amendment retaliation

claim.

Because the Court observes no "special factors counseling hesitation" before inferring a

*Bivens* action, summary judgment is denied as to Defendant Fitzgerald.

(4:10cv2404)

## IV.  Conclusion

For the reasons stated herein, Defendants' motion for summary judgment ([ECF No. 142](#)) is granted as to Defendants Simmons and Butts and denied as to Defendant Fitzgerald.

IT IS SO ORDERED.

    September 25, 2019                    /s/ *Benita Y. Pearson*

Date                                        Benita Y. Pearson
United States District Judge